1
2
3
4
5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>     v.<br><br>CHARLES A. BURRUSS (1),<br>ARDALAAN ADAMS (2),<br>    aka "Armani,"<br>    aka "Ardie,"<br><br>         Defendants. | Case No.  **20cr2980-WQH**<br><br>INFORMATION<br><br>Title 18, U.S.C., Sec. 1349 – Conspiracy to Commit Wire Fraud; Title 18, U.S.C., Sec. 981(a)(1)(C), 982(a)(7), and Title 28, U.S.C., Sec. 2461(c)– Criminal Forfeiture |

The United States charges, at all times material:

INTRODUCTORY ALLEGATIONS

THE MEDICARE PROGRAM

    1.     The Medicare program ("Medicare"), established under Title XVIII of the Social Security Act, was a federal health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Individuals whose health care benefits are covered by Medicare are referred to as Medicare beneficiaries.

DURABLE MEDICAL EQUIPMENT

    2.     Section 1847(a)(2) of the Social Security Act defined Off-The-Shelf ("OTS") orthotics as those which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual.  Orthotics that were paid under section 1834(h) of the Act included leg, arm, back, and neck braces.  The Medicare Benefit Policy Manual

(Publication 100-2), Chapter 15, Section 130 provided the longstanding Medicare definition of "braces": "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body." Braces fell into a category of health care items referred to as Durable Medical Equipment ("DME").

TELEMEDICINE

3.    According to the Medicare Claims Processing Manual, Chapter 12, Section 190, coverage and payment for Medicare telehealth services required: (a) that the beneficiary was located in a rural or health professional shortage area; (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility [not at a beneficiary's home] during the telehealth consultation.

4.    While these Medicare regulations governed reimbursement by Medicare for telehealth consultation services, Medicare contractors maintained that the failure to comply with these requirements undermined a showing of medical necessity when the telehealth consultation resulted in the ordering of DME -- that is, that a telephone consultation was insufficient to establish the need for an orthotic brace. For example, according to the Local Coverage Determination (LCD) in place nationally for services performed on or after October 1, 2015, knee braces were medically necessary only where knee instability was documented by an in-person examination of the beneficiary. Claims expressly were *not* reasonable and necessary if based only on the patient describing knee pain or subjectively reporting instability in the knee. Back braces were covered only when they were ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine. Similarly, shoulder, wrist, and ankle braces must be medically necessary for diagnosis of or to treat an injury or illness. If a spinal orthosis was provided and the coverage criteria was not met, the claim was denied as not medically necessary.

PROVIDER ENROLLMENT

5.    Providers could apply for enrollment in the Medicare program or make a change in their enrollment information using either the Internet-based Provider Enrollment, Chain and Ownership System, or the paper enrollment application process, specifically, by completing and submitting a form called a

"CMS 855A." The CMS 855A required providers to supply information including ownership interest by any entity or individual with "direct or indirect ownership of, a partnership interest in, and/or managing control," where "managing control" included persons who had "operational or managerial control over the provider, or conducts the day-to-day operations of the provider."

6.    The CMS 855A notified applicants of the criminal and civil penalties for falsifying information, and required applicants to sign a certification binding them to "all of the requirements in the Certification Statement," and to "immediately" notify the Medicare contractor if any information furnished on the application was not true, correct, or complete, and of any future changes to the information.

7.    The Certification Statement required the applicant to abide by the Medicare laws, regulations and program instructions, and warned that payment of a claim by Medicare was conditioned upon the claim and underlying transaction complying with Medicare laws, regulations, and program instructions ("including, but not limited to, the Federal anti-kickback statute and the Stark law"). The Certification Statement further required the applicant to agree that he/she would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

OTHER GOVERNMENT HEALTH CARE BENEFIT PROGRAMS

8.    The TRICARE program ("TRICARE") was the federal health care program by the United States Department of Defense for uniformed service members, both active duty and retired, and their families worldwide. TRICARE reimbursed providers for items provided to TRICARE beneficiaries that were deemed to be medically necessary.

9.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care program in which the Department of Veterans Affairs ("VA") shared the cost of covered health care services and supplies with eligible beneficiaries. In general, the VA's CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was the secondary payer to Medicare and would reimburse beneficiaries for costs not covered by Medicare-provided insurance. Where beneficiaries had both Medicare and CHAMPVA, Medicare was the primary insurance.

3

10.     The California Medical Assistance Program ("Medi-Cal") was California's Medicaid program serving low-income individuals, including families, seniors, persons with disabilities, children in foster care, pregnant women, and childless adults with incomes below 138% of federal poverty level. Benefits included ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health and substance use disorder treatment, dental, vision, and long term care and support.

DEFENDANTS AND EVER PRIME CONCEPTS

11.     Charles A. Burruss (BURRUSS) – BURRUSS was a San Diego businessman who created and operated a series of companies in San Diego and elsewhere. In December 2014, he created and was the de-facto owner of PA Healthcare Pharmaceutical Company ("PA Healthcare"), although he listed another individual as the Chief Executive Officer (CEO), the Chief Financial Officer (CFO), and the secretary of the company. In April 2016, he incorporated and was the de-facto owner of Avondale HME Inc. (Avondale) in Arizona, although he listed another individual (described below) as its owner.

12.     Ardalaan "Armani" Adams (ADAMS) – ADAMS was a San Diego businessman who created and operated a series of companies in San Diego and elsewhere.

13.     Ever Prime Concepts, Inc. (Ever Prime) -- Ever Prime was incorporated in California on October 13, 207, at the same address as Avondale. BURRUSS was the CEO and ADAMS was the Chief Operating Officer (COO). Ever Prime purportedly offered "management services" to DME companies, but in reality, was a shell company through which Defendants BURRUS and ADAMS exercised management and control over, and took the majority of profits from, DME companies ostensibly owned by other individuals.

14.     Under the Ever Prime umbrella, between June 2016 and December 2018, BURRUS and ADAMS created, and caused to be created, more than 30 DME companies domiciled in California and elsewhere ("Ever Prime DME Companies"). Although Defendants retained control and most of the profits from the Ever Prime DME Companies, Defendants put the companies in the names of other individuals in order to hide Defendants' involvement and control.

15.     San Diego Co-Conspirator No. 1 (SD CC#1) was a San Diego businessman who worked with BURRUS at PA Healthcare.

4

16. San Diego Co-Conspirator No. 2 (SD CC#2) was SD CC#1's son and a San Diego businessman who worked briefly at PA Healthcare with his father.

17. In approximately fall 2015, SD CC#1 suggested to BURRUSS that PA Healthcare become a DME provider. In mid-2017, BURRUSS and ADAMS loaned money to SD CC#1 help him create a new DME company. SD CC#1 listed his son, SD CC#2, as the owner of that company, and BURRUSS, ADAMS, SD CC#1 and SD CC#2 shared the revenue. Later in 2017, SD CC #1 and SD CC#2 created a second DME company. SD CC#2 was listed as the owner of that company as well, although SD CC#1 conducted the day-to-day operations of both companies.

18. San Diego Co-Conspirator No. 3 (SD CC#3) also worked at PA Healthcare with BURRUSS, SD CC#1, and SD CC#2. BURRUSS listed him as the owner of Avondale. He conducted some of the day-to-day operations of Avondale, and received hundreds of thousands of dollars in proceeds from Avondale's operations, described further below.

19. Nominee Owners 1 through 20 were relatives, friends, and associates of Defendants, who were listed as the owners of one or more DME company by Defendants, even though the Nominee Owner did not actually exercise ownership, control, or management of the DME company, all to obscure Defendants' involvement in the company. Nominee Owners signed Medicare Provider Enrollment Forms containing falsehoods about the ownership and managing control of the DME company, and received tens or hundreds of thousands of dollars from Defendants in exchange for use of their names and doing very little work.

## Count 1
### Conspiracy to Commit Wire Fraud and Pay Illegal Remuneration
(18 U.S.C. § 371)

20. Paragraphs 1 through 19 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

21. Beginning no later than March 24, 2017, defendants CHARLES BURRUSS and ARMANI ADAMS knowingly and intentionally combined, conspired, and agreed with each other and with SD CC #1, SD CC#2, SD CC#3, and with SD Nominee Owners 1 through 2, to knowingly, willfully, and intentionally agree to commit the following offense against the United States: To knowingly and willfully, with the intent to defraud, execute a material scheme to obtain, by means of materially false and fraudulent

pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare and other health care benefit programs, and to use interstate wires in execution of the scheme, in violation of 18 U.S.C. § 1343.

Purpose of the Conspiracy

22.    It was the purpose of the conspiracy for Defendants and their co-conspirators to unlawfully enrich themselves by paying unlawful kickbacks to marketers and others to obtain prescriptions for Medicare beneficiaries, then submit fraudulent claims to Medicare for DME prescribed to those Medicare beneficiaries, while concealing from Medicare the material facts that the prescriptions were signed by physicians who: had no legitimate doctor-patient relationship with the beneficiary; had not conducted a legitimate medical evaluation of the beneficiary; had not impartially determined that the beneficiary actually needed the DME; and were paid kickbacks for each prescription the doctor signed.

Manner and Means of the Conspiracy

23.    The manner and means by which Defendants and their co-conspirators sought to accomplish the objects of the conspiracy included the following:

a.    BURRUSS and ADAMS created, and caused to be created, more than 30 Ever Prime DME Companies domiciled in California and elsewhere. Although Defendants retained control and most of the profits from the Ever Prime DME Companies, Defendants put the companies in the names of Nominee Owners in order to hide their control over the businesses.

b.    In order to bill Medicare for DME items supplied by the Ever Prime DME Companies, Defendants caused 855 Provider Enrollment Applications to be created and signed by Nominee Owners, who falsely represented themselves as the true owners and managers of the Ever Prime DME companies, and failed to identify any other owners, investors, or individuals with managing control over those companies.

c.    In reality, Defendants continued to exercise authority and control and receive a significant portion of the proceeds for the billing of the Ever Prime DME Companies, under the guise that they were providing "management" services. To paper over this arrangement, Defendants created management contracts between the Nominee Owners

6

and Ever Prime Concepts. Defendants knew that if they disclosed their true involvement in the Ever Prime DME Companies, Medicare would not have approved the enrollment applications and permitted the Ever Prime DME Companies to submit bills. Defendants also wanted to avoid scrutiny by Medicare if the same owners and companies submitted too many suspicious DME claims or received too many complaints or returns. Defendants also used their multiple DME companies so they could continue to bill Medicare even if one or more DME company was audited, suspended, or revoked by Medicare. Finally, having more than 30 companies allowed Defendants to multiply their profits.

d.  Defendants partnered and invested with other individuals, including co-conspirators SD CC #1 and his son SD CC #2 in San Diego, in additional DME companies. In such arrangements, Defendants continued to conceal their involvement, by supplying funds or a loan to start up the company, and then taking a percentage of the profits from the amounts collected from Medicare, but avoided accurately being listed on provider enrollment applications as owners or investors.

e.  Instead of waiting until patients brought doctors' prescriptions to them to fill, or conducting traditional marketing and advertising to inform potential customers of their services, Defendants acquired patients for the Ever Prime DME Companies by "purchasing" the patient's information from marketers: Defendants paid so-called "marketing" companies to provide a Medicare beneficiary's personal identifiers, Medicare beneficiary number, and a signed doctor's order for the DME – in other words, paying a kickback in exchange for referral of a Medicare patient to Defendants. This set of complete information that could be used to bill Medicare was referred to as a "doctor's order" or "D.O."

f.  The marketing companies operated call centers in locations such as India, the Philippines, and Mexico, and solicited Medicare beneficiaries through high-pressure sales tactics, cold-calls, and multiple harassing phone calls each day to elderly and often infirm Medicare beneficiaries. Some marketing companies confronted elderly people

as they were leaving hospitals to ask if they were Medicare beneficiaries and wanted DME products.

g.  The high pressure sales attempts included representations to beneficiaries that their doctors had or would recommend the DME products for them and that the DME was "free" under Medicare

h.  The high pressure sales attempts also included efforts to "upsell" the beneficiary, that is, to induce the beneficiary to agree to accept as many braces as possible, up to an ideal referred to by some marketers as the "Iron Man Kit"—consisting of two wrist braces, two arm/ shoulder braces, two knee braces, and one back brace.  Some examples of the "upselling" that was part of the conspiracy, and of unnecessary and unwanted DME products billed to Medicare by Defendants and their co-conspirators as part of the conspiracy, include:

    i.  In about May 2017, 67-year-old Medicare beneficiary H.M. of Oceanside, California, called a telephone number from a television advertisement and asked for a knee brace.  The call center employee told him that he would not have to pay for it.  H.M. never spoke with a doctor about the knee brace.  When the box arrived it contained several other braces including a back brace, arm, ankle and hand braces.  H.M. called the company to tell them that he did not need the other braces.  The person at the company told him it was fine, it didn't matter and not to return the braces.  H.M. had not discussed any need for a knee brace with his primary care physician, and had not obtained a prescription from his primary care physician.  H.M. ended up donating the braces.

    ii.  68-year old Medicare beneficiary E.R., of Spring Valley, received over 15 packages containing medical braces.  The packages started arriving in June 2018.  E.R.'s son wrote "return to sender" on the packages when they arrived, and attempted to mail them back to the provider.  He tried to call the number for the companies who send the braces but was never able to reach anyone.  E.R. was able to reach someone at the company, and told the person she did not need the

braces. E.R. was never treated by any of the four referring physicians who were identified on claims to Medicare for the braces supplied to E.R.

iii. Late in 2018, 58-year old Medicare beneficiary C.M. of San Diego met a man outside of St. Vincent's Hospital in San Diego, who asked C.M. if he had a Medicare card and advised C.M. that he could receive braces if he was interested. C.M. said he was interested in shoulder, back and knee braces. C.M. gave his Medicare and Medi-Cal information. A short time later C.M. received two telephone calls. One of the callers identified himself as a doctor, and asked about C.M.'s pain. That doctor never examined C.M. C.M. received the braces in the mail.

iv. Medicare beneficiary J.G., of Imperial Beach, California, received multiple unsolicited calls from telemarketers offering braces. J.G. did not speak with a doctor during those calls. During one call, the telemarketer asked if J.G. wanted a back, knee or shoulder brace, and said J.G. had been approved for a back brace and qualified for additional braces. Later, a telemarketer told J.G since he had Medicare, he could get a shoulder brace and a knee brace for J.G.'s reported pain. J.G. later received two knee braces, wrist braces and one back brace. The braces caused him pain so he did not wear them.

v. Medicare beneficiary N.R., of San Diego, received multiple unsolicited telephone calls offering braces and topical pain creams. In October 2018, N.R. agreed to request ankle and knee braces. N.R. never spoke with a doctor. N.R. never received the braces ordered from the call center.

i. In each of the examples outlined above, Defendants and their co-conspirators fraudulently billed Medicare for the DMEs, even though they had no reason to believe the DME products were medically necessary in most cases, the DME was not properly prescribed by any physician, Defendants concealed from Medicare their involvement in the DME Companies, and some of the DME products were never provided to the patients.

j.  The marketing companies contracted with telemedicine companies to supply signatures of physicians on the DME prescriptions, and to have a physician speak briefly to the Medicare beneficiary or review a recorded phone call with a telemarketer and the beneficiary -- to give some semblance of physician review of the prescription, although Defendants and their co-conspirators knew that in some cases the contact did not meet Medicare's standards for telemedicine or establish the necessary coverage conditions.

k.  Defendants knew that the beneficiaries were obtained via high-pressure sales tactics and that no physician legitimately prescribed the DME, because the marketing companies routinely supplied to Defendants the recordings that the telemarketers had conducted with beneficiaries.  These recordings revealed that telemarketers had in some cases initiated the calls, beneficiaries were pushed into accepting DME products despite their resistance or confusion, and that physicians made minimal, if any, contact with the patient.

l.  In an arrangement that created an incentive for marketers to "upsell" as much as possible, Defendants paid the marketing companies bribes and kickbacks, disguised as "marketing fees," for *each* DME product that was in a D.O., with a going rate of $280 apiece.  Defendants, through Ever Prime, paid more than $64 million in kickbacks to companies that sold D.O.'s.

m.  In turn, Defendants submitted claims to Medicare typically for thousands of dollars per beneficiary, falsely representing that the claim complied with all laws and Medicare regulations, including the anti-kickback provisions.

n.  When one of the Ever Prime DME Companies was suspended or revoked, Defendants evaded Medicare's attempt to stop the fraud by simply using another of the Ever Prime DME Companies to submit bills to Medicare.  Some examples of these efforts to evade Medicare's audit and enforcement efforts include the following:

    i.  From August 2017 to mid-January 2018, Avondale was billing Medicare approximately $2 million to $4 million per month for DME.  In late March or

early April 2018, CMS revoked Avondale's billing privileges due to its failure to furnish requested medical records in support of billing for knee braces.

ii.   From August 2017 to November 2017, Avondale 2, another one of Defendants' Ever Prime DME Companies, billed Medicare for no more than 806 claims per month, for 276 patients, with average monthly billings of approximately $835,000. Within two months of Avondale 1's revocation, Defendants and their co-conspirators simply switched to using Avondale 2—and its billings skyrocketed to between 1,086 and 4,761 claims per month, for up to 1,728 beneficiaries, with average monthly billings from June 2018 to January 2019 of approximately $2.2 million.

iii.   The first month of billing for Avondale 3, yet another of Defendants' Ever Prime DME Companies, to Medicare was submitted in January 2018 (after Avondale 1 had been asked to provide records to CMS), at a volume of 388 claims for 72 patients. In March and after, the volume increased to as high as 4,409 in a single month, for up to 1,597 beneficiaries, with average monthly billings of approximately $2 million.

o.   In their "management" role, Defendants caused claims to be submitted in the names of their various Ever Prime DME Companies, further concealing from Medicare Defendants' true ownership and control in those DME companies, in violation of the provider agreements for those DME companies.

p.   Defendants and their co-conspirators knew that the claims they submitted and caused to be submitted falsely represented that they were for DME that was medically necessary for the beneficiary.

q.   Defendants and their co-conspirators knew that their scheme put patients at risk, as it did not provide clinical care by a qualified orthotic professional and could lead to providing medically unnecessary or detrimental orthoses with no instruction on the proper fitting, care, or use.

r.  Defendants submitted bills to Medicare, using interstate wires to execute their scheme, for DME products supplied through more than 30 DME companies, for more than 181,218 Medicare individual beneficiaries nationwide, including 11,312 residents of California.

s.  Using these manners and means, among others, BURRUSS and ADAMS and their co-conspirators, submitted and caused to be submitted claims to Medicare, CHAMPVA, TRICARE, and Medi-Cal totaling more than $871,656,629.87 for DME procured through the payment of bribes and kickbacks, and the making of false and fraudulent representations.  Those government programs paid a total of $424,648,137 on those claims.

All in violation of Title 18, United States Code, Section 1349.

## CRIMINAL FORFEITURE

24.  Paragraphs 1 through 19 of this Information are realleged and incorporated as if fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(7) and Title 28, United States Code, Section 2461(c).

25.  Upon conviction of the offense of Conspiracy alleged in Count 1, defendants CHARLES A. BURRUSS and ARDALAAN ADAMS shall forfeit to the United States all right, title, and interest in any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of such offense.

26.  If, as a result of any act or omission of defendants CHARLES A. BURRUSS and ARDALAAN ADAMS any of the forfeitable property, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable herein by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the property described above subject to forfeiture.

12

27.    All pursuant to Title 18, United States Code, Section 981(a)(1)(C), 982(a)(7), and Title 28, United States Code, Section 2461(c).

ROBERT S. BREWER, JR.
United States Attorney

DATED:  9/28/2020

VALERIE H. CHU
Assistant U.S. Attorney

BLANCA QUINTERO
Assistant U.S. Attorney

13